# EXHIBIT 1

**ZEISS**

Carl Zeiss Industrial Metrology, LLC, 6250 Sycamore Lane North, Minneapolis, MN 55369

Oakland Automation LLC
13017 Newburgh Rd
Livonia MI  48150-5009

<table>
<tr><td colspan="3"><strong>Projects</strong></td></tr>
<tr><td colspan="3">Please always indicate:</td></tr>
<tr><td><strong>P.O.No.</strong></td><td><strong>/ P.grp.</strong></td><td><strong>/ Date</strong></td></tr>
<tr><td>6810008615</td><td>/ U20</td><td>/ 03/01/2022</td></tr>
<tr><td><strong>Contact</strong></td><td colspan="2"><strong>/ Phone</strong></td></tr>
<tr><td>Nadim Zeineddine</td><td colspan="2">/ 810.206.5014</td></tr>
<tr><td colspan="3"><strong>e-mail address</strong></td></tr>
<tr><td colspan="3">nadim.zeineddine@zeiss.com</td></tr>
<tr><td colspan="3"><strong>issued on: 03/02/2022</strong></td></tr>
</table>

**Vendor Account Number**        5711290

**Ship-to party:**        Toyota Motor Manufacturing Texas
                          1 Lone Star Pass
                          San Antonio TX  78264

**Bill-to party:**
Carl Zeiss Industrial Metrology, LLC
6250 Sycamore Lane North
Maple Grove, MN 55369

Terms of Delivery:        FCA Maple Grove
Terms of Payment:        within 60 days Due net

o Terms and Conditions:
   # This purchase order incorporates all Terms and Conditions which are available at www.zeiss.com/metrology/terms-and-conditions Acceptance of this purchase order by Seller constitutes acceptance of all terms.
o Freight Requirements:
   # http://www.zeiss.com/metrology/routing-guide
o Order acknowledgement:
   # Within 48 hours acknowledgement is required on price, part number revision level, and delivery date.
   # The Delivery Due date is the date the product is to be at our specified Ship to location
   # All material or part numbers MUST conform to our drawings at the specified revision level
o Fulfillment:
   # The Seller is responsible for any premium freight charges incurred to meet the acknowledged Delivery Due Date
   # Our Purchase Order Number and applicable part numbers MUST appear on all packing slips, freight documents, and invoices.
   # A packing list MUST accompany all shipments
   # If the Ship To is a drop shipment (not to a ZEISS facility), proof of delivery is required

**We accept your invoice digitally by sending a pdf file to invoice.am@zeiss.com. In case of any queries, please contact iqs_us_apteam@zeiss.com.**

Please send us your order confirmation for the following items within 48 hours

| Item | Material No. | Quantity | Unit | Price per Unit | Total (USD) |
|------|-------------|----------|------|----------------|-------------|

**-2 -**

| | | | |
|---|---|---|---|
| F.E.I.N # | 13-3917663 | Carl Zeiss Industrial Metrology, LLC | |
| MN TAX ID# | 0030045737 | 6250 Sycamore Lane North | |
| DUNS | 96-271-2550 | Maple Grove, MN 55369 | |
| | | (763)744-2400 Fax(763) 533-0219 | |

| **P.O. Number** | **/ P.grp.** | **/ Date** | | | **Page 2** |
|---|---|---|---|---|---|
| 6810008615 | / U20 | / 03/01/2022 | | | |

---

**Description**

---

| 00010 | | **1** | piece | 195,000.00 | 195,000.00 |
|---|---|---|---|---|---|

*Q210057B ZEISS TMMTX ABIS 30% Down

Delivery Date Day **03/15/2022**

Toyota San Antonio 3 Robot ABIS Cell for BIW
Project: PR621246
ZEISS PM: Kurt Gardner 248-719-0630
Toyota Lead: Thierry Mizero
Toyota Motor Manufacturing Texas
1 Lone Star Pass,
San Antonio, TX 78264

| 00020 | | **1** | piece | 390,000.00 | 390,000.00 |
|---|---|---|---|---|---|

Q210057B ZEISS TMMTX ABIS 60% @Signoff

Delivery Date Day **11/01/2022**

| 00030 | | **1** | piece | 65,000.00 | 65,000.00 |
|---|---|---|---|---|---|

Q210057B ZEISS TMMTX ABIS 10% @Install

Delivery Date Day **01/15/2023**

---

| | Total USD | | | | 650,000.00 |
|---|---|---|---|---|---|

---

Carl Zeiss Industrial Metrology, LLC
(Buyer: Nadim Zeineddine)
This agreement is made governed and pursuant to the laws of the state of  New York, USA.

1. **COMPLETE  AGREEMENT**

   This Order (as defined below) between  both the ZEISS company ("ZEISS") and the Seller (the "SELLER") named in this Order (describing the subject of purchase ("Front"), will become a binding agreement upon SELLER's acknowledgment accepting this Order ("Order"), or the start of performance of this Order, whichever occurs first.  SELLER and ZEISS are referred to together as the "Parties".  This Order, together with any specifications, drawings, and any other documents agreed to in writing by the Parties,  are a part of the agreement between the Parties and supersedes all other prior documents, discussions, etc., relating to this Order.   Any reference to SELLER's quotation, bid, or proposal does not imply acceptance of any term, condition, or instruction that isn't expressly incorporated in this Order.  Specific information on the Front will supersede the general terms of this Order.  If this Order references a US Government Prime Contract ("Prime Contract"), then it is considered a subcontract and SELLER must perform and comply with the contractual obligations, regulations, and laws applicable to subcontractors under the Prime Contract.

   SELLER's communications (e.g.: acknowledgement forms) in connection with this Order will be construed to be for record and accounting purpose only.  Any terms or conditions in such communications will not apply and are expressly excluded. Trade custom and trade usage are superseded by, and will not be applicable in the interpretation of, this Order.  If there are ambiguities, conflicts, or discrepancies in the specifications, drawings, or other documents which are a part of this Order, SELLER will immediately submit the matter to ZEISS for its determination and will comply with ZEISS's determination. All headings in this Order are for reference only.

2. **TITLE**

   SELLER warrants and provides to ZEISS full and unrestricted title to all Goods ("Goods") and Services ("Services") which SELLER furnishes under this Order, free and clear of all liens, restrictions, security interests, and encumbrances. If ZEISS makes progress payments to SELLER title to the Goods will pass to ZEISS when SELLER identifies the Goods for this Order. SELLER will clearly identify the Goods as ZEISS's property by visible marking or tagging and ZEISS may, at its option, inspect and verify that the Goods have been identified as ZEISS's property. Care, custody, and control of such Goods remain with the SELLER until such time as ZEISS takes physical possession or otherwise agrees in writing by change order to this Order. All shop drawings, patterns, tools or other items made in connection with the production of any Goods are ZEISS's property and upon demand will be delivered to ZEISS.

3. **RESERVATION OF RIGHTS**

   The inspection (or lack thereof), or payment for the Goods covered by this Order will not impair ZEISS's right to reject nonconforming or defective Goods or be deemed to constitute acceptance by ZEISS of the Goods or Services, or affect in any way SELLER's obligations under this Order notwithstanding ZEISS's opportunity to inspect the Goods or Services. ZEISS's knowledge of the nonconformity or defect, its substantiality or the ease of its discovery or ZEISS's failure to earlier reject the Goods or Services.

4. **WAIVER**

   The failure of a party to enforce this Agreement, or any provision of it, will not constitute a waiver of this Agreement or that provision, and will not constitute a waiver of the same in the future.

5. **PRICE**

   This Order may not be filled at prices higher than shown on the Front without ZEISS's prior written approval.  If no price is shown, SELLER will furnish Goods/Services at a price no higher than the price last purchased or will notify and obtain the written approval of ZEISS before proceeding with this Order.

6. **CASH DISCOUNTS**

   Cash discounts, if any, will be computed as commencing with the receipt of the invoice or of the Goods/Services, whichever is received later.

7. **TAXES**

   SELLER will pay all taxes now or hereafter imposed by law on or on account of the production, sale, shipment, or use of any Goods covered by this Order, except for such taxes arising from ownership of the Goods.

8. **EXTRAS**
Extra charges must be approved in writing, in advance, by ZEISS's Purchasing Department.

9. **PACKING SLIPS**
Separate packing slips will be included in each shipment showing order number, quantity, part number, and description of the Goods being delivered.

10. **PACKING AND TRANSPORTATION CHARGES**
Charges for packing, boxing, cartage, rigging, insurance, or transportation must be specifically stated to be payable under this Order.

11. **INSPECTION**
Goods/Services are subject to ZEISS's reasonable inspection, testing, and approval, at ZEISS's destination. Notwithstanding prior payment, if the Goods/Services are not in accordance with this Order or SELLER's representations or warranties, ZEISS may, reject or revoke acceptance, return any Goods for full credit or cash refund at its option, and cancel any remaining unshipped portion of this Order without obligation. The foregoing will only apply when inspection of the Goods may reasonably be made. Goods rejected as nonconforming will be returned at SELLER's expense, including transportation and handling.

12. **WARRANTY**
In addition to any express SELLER warranties, SELLER warrants that the Goods will: (i)be merchantable, (ii) conform to this Order and to specifications, drawings, and other descriptions referenced in this Order and to any accepted samples, (iii) be free from defects in materials, workmanship, and design (unless ZEISS provided the design), and (iv) will be fit for sale, ordinary use, or use for the intended purposes, to the extent SELLER knows of ZEISS's intended use. Services will be provided in at least a competent, professional (workmanlike) manner, pursuant to the highest relevant industry standards. SELLER further warrants that all Goods and their packaging materials will be produced, packaged, marked, and labeled in compliance with applicable state and federal laws and regulations, including without limitation state laws relating to packaging requirements for heavy metals, and that SELLER has obtained the necessary government approvals and certifications. SELLER also represents and warrants that any Goods and Services do not infringe any United States or foreign patent, trademark, trade secret or copyright, or any proprietary, intellectual property, industrial property, contract or other right held by any third party. SELLER will, at its expense including, without limitation costs of removal, packing, transportation and reinstallation, promptly, at ZEISS's option, either repair, replace, or refund the purchase price paid for any Goods and Services furnished to ZEISS within 12 months after operational startup or within 18 months after shipment, whichever occurs first, which fail to conform to the requirements of this Order. If ZEISS gives SELLER notice of a failure or defect, and SELLER fails to take reasonably prompt and effective action to correct the failure or defect, ZEISS may make repairs and SELLER will pay for the costs. Except for additional express SELLER warranties, these warranties are in lieu of all other warranties implied.

13. **RECALL**
If a recall of the Goods is required by a defect (in design, material, or workmanship), a failure to conform to specifications, applicable laws, or any other reason within SELLER's control, SELLER will bear all cost and expenses of such recall, including without limitation, the costs of notifying customers, customer refunds, cost of returning Goods, and other expenses incurred to meet its obligations to third parties.

14. **INDEMNIFICATION**
SELLER will defend and hold harmless ZEISS, its successors, assigns, employees, customers, and users of the Goods or Services, with respect to all claims, liability, damage, loss, and expenses, including reasonable attorney's fees, incurred relating to or caused by: (a) actual or alleged claim of infringement of patent, copyright, trademark or other rights, misappropriation of trade secrets, breach of confidential relationships or violation of other property right arising out of the purchase, sale of use of the Goods or service covered by this Order; (b) actual or alleged defects in the Goods or in the design, manufacture or material of the Goods or provision of Services; (c) actual or alleged breach of warranty, (d) failure of SELLER to deliver the Goods or Services on a timely basis, (e) failure of the Goods or Services to meet the requirements of all federal, state or local laws, or (f) a breach of the obligations of section 20 of this

Order.

If there is a claim under this Section, ZEISS may, at its option, terminate this Order or defer acceptance of the balance of the Goods or Services ordered until the claim is resolved. If ZEISS is enjoined from the use of the Goods, SELLER will, at ZEISS's option, either procure for ZEISS the right to continue to use the Goods, replace the Goods with substantially equivalent Goods, modify the Goods so as to be useable by ZEISS or repurchase the Goods at the price set forth in this Order (or at a prorated price if the event occurs more than 3 years from end of the warranty).

This section shall not be construed to indemnify ZEISS for any loss to the extent it is attributable to ZEISS's design, specification, or negligence.

## 15. INSURANCE
SELLER will (unless higher coverages are required and agreed to by the Parties in an Order) maintain minimum general comprehensive liability insurance covering each occurrence of bodily injury and property damage of $1 million combined single limit with special endorsements providing coverage for (a) Products and Completed Operations Liability; (b) Blanket Broad Form Vendor's Liability, and (c) Blanket Contractual Liability; during and for three years after the last delivery made under this Order.

If Services are performed under this Order on ZEISS's premises, SELLER shall also obtain Premises-Operations, Personal injury and independent Contractors Protective Liability endorsements and shall further obtain Workers' Compensation, Employer's Liability and Automotive Liability Insurance coverage in amounts acceptable to ZEISS. If requested, SELLER shall furnish ZEISS with a certificate evidencing the required insurance.

## 16. RISK OF LOSS
SELLER bears the risk of loss (including damage) to the Goods until the Goods are delivered to and accepted by ZEISS.

## 17. BUYER FURNISHED MATERIAL
SELLER may not use, reproduce, or appropriate for anyone other than ZEISS, any material, tooling, dies, drawing, designs, or other property or information furnished by ZEISS ("Material") without ZEISS's prior written approval. Title to all Material shall remain in ZEISS at all times, and where practicable the Material shall be clearly marked or tagged to indicate this ownership. SELLER shall bear the risk of loss (including damage) to the Material until it is returned to ZEISS. All Material, whether or not spoiled or used, shall be returned to ZEISS at termination or completion of this Order unless ZEISS shall otherwise direct. SELLER agrees to hold in confidence and to use only for the benefit of ZEISS all methods, processes, techniques, shop practices, formulas, compounds, compositions, equipment, designs, drawings, blueprints, specifications, research data, marketing and sales information, customers lists, plans and information provided or know-how and trade secrets owned by ZEISS or in ZEISS's possession and disclosed to SELLER.. Until such information has been lawfully published or disclosed to the general public, SELLER agrees not to use or disclose such information to others and then only with ZEISS's prior written consent.

## 18. REFERENCES TO BUYER
Except as required by law, SELLER shall make no reference, advertisement, or promotion regarding ZEISS or ZEISS's purchase or use of the Goods or Services without ZEISS's prior written consent.

## 19. USE OF SELLER'S INFORMATION
All information disclosed to ZEISS by SELLER in connection with this Order is furnished as part of the consideration for ZEISS's placement of this Order. This information is not to be treated as confidential or proprietary, and no claim will be asserted against ZEISS, its assigns, or customers for its disclosure or use.

## 20. NONDISCLOSURE
Under this Order, ZEISS may be required to make available to SELLER certain information which ZEISS may consider Proprietary and/or Confidential , which may be considered Proprietary and/or Confidential to the United States government ("Government") or to other third parties, or that which ZEISS is required to keep confidential including (without limitation), information related to patents, research, development, computer software, designs or processes,

pricing, trade secrets, customer lists and technical and business information and know-how of ZEISS, its customers and/or of the Government ("Confidential Information"). SELLER will safeguard and hold in strictest confidence all Confidential Information.  Confidential Information will remain ZEISS's property (or the Government or third party, as the case may be). No right or license, express or implied, is granted by this Order in any Confidential Information except to the limited extent required to provide the Goods or Services. If SELLER is provided access to ZEISS's information systems (e.g.: e-mail, internet, intranet) (collectively or severally computer business systems "CBS" ), then SELLER will treat information received from CBS as Confidential Information. Access to these computer business systems may be withdrawn at any time, with or without reason or notice. ZEISS may monitor SELLER's use of its CBS. SELLER will use ZEISS's CBS in an appropriate manner, consistent with ZEISS's requirements, and will only use Confidential Information to fulfill this Order. SELLER must inform its employees who are given access to ZEISS's Confidential Information or CBS of the restrictions contained in this paragraph and must obtain such employees' written agreement that they will be bound by the restrictions contained in this paragraph. At ZEISS's request, SELLER will provide ZEISS copies of its employees' written agreements.

SELLER's breach of this Article may cause irreparable injury to ZEISS, for which monetary damages are not an adequate remedy.  In addition to any other relief afford by law or in equity, ZEISS may immediately terminate this Order for default, in whole or in part, and seek and obtain reasonable, injunctive relief from the breach of SELLER's obligations under this Article. SELLER's obligations as it relates to Confidential Information of ZEISS, the Government, or third-party Confidential Information which ZEISS is required to keep confidential, shall survive in perpetuity, unless a shorter period is specified by ZEISS, the Government, or a third party.

SELLER shall, require its lower-tier subcontractors or consultants to execute a subcontract or a nondisclosure agreement substantially similar to this Article, when Confidential Information is to be disclosed to lower-tier subcontractors or consultants. SELLER shall comply with any stricter non-disclosure/safeguarding-of-information obligations in a Prime Contract, or as may become necessary in performance of this Order.

21. **INTELLECTUAL  PROPERTY**
If this Order arises under a Prime Contract, then SELLER acknowledges applicable Government rights in data, inventions, and computer software, and computer software documentation. Unless agreed otherwise, SELLER grants to ZEISS an unlimited, irrevocable, fully paid up, royalty-free right to use, make, have made, sell,  offer for sale, reproduce, display, perform, distribute copies to the public, prepare derivative works, and authorize others to do so, in any and all, inventions, discoveries, improvements, mask works, patents as well as any and all data, reports, information, copyrights and works of authorship, which are conceived, developed, generated or delivered in performance of this Order. SELLER shall not deliver, and shall not incorporate into any deliverable, any third party data protected by copyright or similar right (including Open Source Software, unless previously discussed with ZEISS and warranted to be used in a manner which doesn't impede or expose ZEISS to copyleft requirements). The Parties agree that all original works of authorship fixed in any tangible form, including software improvements, enhancements, derivative works and mask works, whether specially ordered or commissioned, made by SELLER alone or jointly with others in connection with this Order, are hereby assigned, conveyed and transferred to ZEISS. Without any additional consideration, the author of the work agrees to execute all necessary documents to transfer and assign all right, title and interest, including all copyrights, in said works to ZEISS.

22. **CANCELLATION FOR DEFAULT**
If SELLER is adjudged bankrupt, makes a general assignment for the benefit of its creditors, or if a receiver shall be appointed on account of ZEISS's insolvency or if SELLER is in default of any provisions or requirement of this Order, or if SELLER fails to make progress so as to endanger performance of the Prime Contract, or SELLER or its employees or agents engage in conduct in violation of laws applicable to fraud or public contracting in performance of this Order, or if SELLER is suspended or debarred by the Government, ZEISS may, by written notice to SELLER, without prejudice to any other rights or remedies which ZEISS may have at law or equity, and without further liability or obligation to SELLER, cancel further performance by SELLER under this Order and ZEISS may complete the performance of the Order by such means as ZEISS selects, and SELLER shall be responsible for any additional costs incurred by ZEISS in doing so SELLER shall deliver or assign to ZEISS any work-in-progress, and any amounts due SELLER for Goods and Services completed by SELLER in full compliance with this Order prior to such cancellation shall be subject to set off of ZEISS's

additional costs of completing the Order and other damages incurred by ZEISS as a result of SELLER's default. Waiver by ZEISS of any default of SELLER shall not be considered to be a waiver by ZEISS of any provision of this Order or of any subsequent SELLER default.

**23. TERMINATION FOR CONVENIENCE**

ZEISS may, at any time, terminate all or part of this Order for its convenience by written notice to SELLER. On the date of termination stated in the notice, SELLER shall discontinue all work pertaining to this Order, SELLER shall place no additional material or component orders supporting this Order, and SELLER shall preserve and protect materials on hand purchased for or committed to this Order, work in progress, and completed work both in SELLER's and SELLER's supplier's plants pending ZEISS's instructions, and shall dispose of same in accordance with ZEISS's instructions. Payment to SELLER or refund to ZEISS, if any, shall be promptly and mutually agreed to by ZEISS and SELLER based on that portion of work satisfactorily performed to the date of cancellation, including reimbursement for reasonable and necessary expenses resulting from the termination, as substantiated by documentation satisfactory to and verified by ZEISS, disposition of work and materials on hand and amounts previously paid by ZEISS. SELLER shall not be entitled to any loss of prospective profits, contribution to overhead or incidental, consequential or other damages because of such termination. Payment made under this clause will constitute ZEISS's only liability and SELLER's exclusive remedy if ZEISS terminates this Order for convenience. Such payment by ZEISS shall not exceed the contract price for the Goods/Services that are the subject of ZEISS's termination for convenience.

**24. SET-OFF**

ZEISS may set off money due SELLER under this Order against any good-faith counter claim against SELLER or its related entities which arise out of this Order.

**25. DELAYS**

Time is of the essence for this Order. SELLER shall promptly notify ZEISS of any actual or anticipated delay in delivery and take all reasonable steps to avoid or end delays without additional cost to ZEISS. Where the delay is caused by acts of God, acts of civil or military authority, epidemics, war, riot, strikes, or similar cause beyond SELLER's control and which SELLER could not have reasonably foreseen or provided against, ZEISS shall have the right to either (a) terminate by written notice to SELLER all or part of this Order; or (b) extend SELLER's performance for a period equal to the duration of the delay, but SELLER shall not be entitled to any extra compensation for such delay. SELLER shall not be excused from performance hereunder where alternate sources of supply of materials, Goods, or Services are not available. Strikes, fires, accidents or any other causes beyond the reasonable control of ZEISS that affect the ZEISS's ability to receive and use or sell the Goods or Services ordered shall constitute valid ground for ZEISS's suspension of performance or cancellation of this Order, upon written notification to the SELLER and without penalty to ZEISS.

**26. ASSIGNMENT**

This Order, or any portion of it, may not be assigned or delegated without ZEISS's prior written consent. Any such assignment or delegation will be void. ZEISS reserves the right to assign this Order to ZEISS's affiliates.

**27. CHANGES**

ZEISS may at any time, prior to the delivery date, by written direction, make changes in the specifications, drawings, packaging, quantities (if reasonable), time, place and method of delivery, for Goods or Services covered by this Order. If SELLER believes that such change effects the price or delivery date for such Goods or Services, SELLER shall so notify ZEISS in writing (with adequate supporting documentation) within 2 calendar days after receipt of said direction. SELLER shall suspend performance of the change unless thereafter released in writing by ZEISS to perform such change, and ZEISS and SELLER shall mutually agree in writing upon an equitable adjustment in the price and/or delivery date to reflect the effect of such change. SELLER's request for any adjustments shall be deemed waived unless submitted in writing within 2 calendar days after SELLER receives direction to make such changes. SELLER shall not suspend performance of the unaffected portion of this Order while ZEISS and SELLER are in the process of making such changes and any related adjustments or at any time thereafter unless so instructed in writing by ZEISS. If released in writing by ZEISS, SELLER shall comply with and perform such change in accordance with this Order during the time SELLER and ZEISS require to mutually agree upon an equitable adjustment. No substitutions shall be made in this Order without prior written authority of ZEISS. No agreement or understanding modifying the terms and condition

of this Order shall be binding upon ZEISS nor will extra compensation be paid by ZEISS unless the agreement or understanding is made in writing.

**28. LAWS AND REGULATIONS**

SELLER warrants that the manufacturing, packaging, pricing, sale, and delivery of all Goods and performance of Services supplied pursuant to this Order will comply with all applicable laws, ordinances and regulations, and SELLER shall provide all permits, certificates, and licenses which may be required for the performance of the Order.

**29. GOVERNING LAW**

This Order and the performance under it shall be governed by New York law, without use of any of its conflict-of-laws provisions, and also excluding the U.N. Convention on International Sales of Goods. The parties will resolve any disputes between them in the courts in New York, and waive the right to a trial by jury, to the extent permitted by law. The venue for any disputes will be in the State of New York, and the parties consent to the exclusive jurisdiction of the federal courts located in New York County, New York, U.S.A. Notwithstanding the foregoing, provisions of this Order relating to the United States Government as the customer of ZEISS, or relating to a prime contract between ZEISS and the Government, shall be governed by and construed in accordance with the law of the United States Government contracts as set forth by statute and regulations, and decisions by the appropriate courts and Board of Contract Appeals.

If this Order is pursuant to a Prime Contract or Subcontract between ZEISS and the Government, the Prime Contract is subject to the Contract Disputes Act of 1978 (Public Law 95-563) and contains Federal Acquisition Regulation (FAR) clause 52.233-1 Disputes. All disputes between ZEISS and SELLER relating in any manner to the terms and performance of the Prime Contract shall therefore be resolved between ZEISS and SELLER in a manner consistent with the disputes mechanism of the Prime Contract. If a final decision is issued by the Contracting Officer under the Prime Contract "Disputes" clause and the decision relates to this Order, and is binding upon ZEISS under the Prime Contract, it shall also be binding upon SELLER and ZEISS with respect to this Agreement. However, if the SELLER is affected by such decision, and if ZEISS elects not to appeal such decision under the "Disputes" clause of the Prime Contract, ZEISS shall notify SELLER of such decision promptly. After receipt of such notice by ZEISS, SELLER may submit a timely request to ZEISS to appeal such decision. If ZEISS elects to appeal the Government's decision, whether at its election or at SELLER's request, any decision upon such appeal, if binding upon ZEISS under the Prime Contract, shall be binding upon ZEISS and SELLER under this Order. If ZEISS takes or brings such appeal or suit, SELLER shall assist ZEISS in its prosecution thereof in every reasonable manner. SELLER shall pay all costs and expenses incurred by ZEISS in prosecuting any suit or appeal brought at SELLER's request. To the extent requested by ZEISS, SELLER shall prosecute for ZEISS any appeal or suit taken or brought at SELLER's request. SELLER shall pay all costs and expenses incurred by SELLER and ZEISS in prosecuting any appeal or suit brought at SELLER's request, and shall indemnify and hold ZEISS harmless from any and all damages, claims, investigations or other losses arising from SELLER's prosecution of any claim or appeal for ZEISS. The rights and obligations specified in this Article shall survive completion of and final payment under this Agreement.

**30. SAFETY AND HEALTH**

SELLER shall comply with "The Federal Occupational Safety and Health Act of 1970" as amended, and all standards and regulations issued there under, and any other rules or regulations issued by bodies having jurisdiction over this class of work.

**31. EQUAL EMPLOYMENT OPPORTUNITY**

The Equal Employment Opportunity provisions in section 202, paragraphs 1 through 7 of Executive Order 11246, as amended, Executive Order 11701 relative to equal employment opportunity and the employment of veterans, the Rehabilitation Act of 1973, as amended, relative to equal employment of handicapped individuals, and the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended, relative to equal employment of disabled veterans, special disabled veterans, veterans of the Vietnam Era, recently separated veterans, and other protected veterans, and the implementing rules and regulations there under are incorporated herein by specific reference and SELLER shall comply with the provisions as applicable to this Order. During the performance of this Order, the SELLER agrees to comply with all federal, state, and local laws respecting discrimination in employment and non-segregation of facilities including, but

not limited to, requirements set out at 41 CFR §60-1.4(a); 41 CFR §60-300.5(a); 41 CFR §60-741.5(a) and 29 CFR Part 471, Appendix A to Subpart A.  Contractor/vendor must abide by non-segregation regulations at 41 CFR §60-1.8 and any applicable affirmative action obligations as required by 41 CFR §60-1.40(a)(2). **All Parties shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.** SELLER shall comply with all applicable provisions of Executive Order 13201 and related rules, regulations, and orders of the Secretary of Labor, requiring non-exempt federal contractors and subcontractors to post notices informing their employees that they have certain rights related to union membership and use of union dues and fees, which provisions are incorporated herein by reference.

## 32. UTILIZATION OF SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS CONCERNS

It is the policy of the United States that small business and small business concerns owned and controlled by socially and economical disadvantaged individuals  shall have the maximum practicable opportunity to participate in the performance of contracts set by any federal agency; (b) SELLER hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract. SELLER further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the contractor's compliance with this clause; (c) As used in this contract, the terms "small business concern" shall mean a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto the terms "small business concern owned and controlled by socially and economically disadvantaged individuals" hereafter referred to as disadvantage business shall mean a small business concern, which is at least 51 percent owned by one or more socially and economically disadvantaged individuals, or in the case of any publicly owned business at least 51 percent of the stock is owned by one or more socially and economically disadvantaged individuals, and whose management and daily business operations are controlled by one or more such  individuals. SELLER shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans (such as American Indians, Eskimos, Aleuts, and Native Hawaiians), or any other individuals found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act.; (d) SELLER acting in good faith may rely on written representations by its subcontractors regarding their status either as small business concern or a small business concern owned and controlled by socially and economically disadvantaged individuals.

## 33. EXPORT CONTROL COMPLIANCE FOR FOREIGN PERSONS

The subject technology of this Order (together including data, Services, and hardware provided hereunder), if any, may be controlled for export purposes under the International Traffic in Arms Regulations (ITAR) controlled by the U.S. Department of State or the Export Administration Regulations ("EAR") controlled by the U.S. Department of Commerce. ITAR controlled technology may not be exported without prior written authorization and certain EAR technology requires a prior license depending upon its categorization, destination, end-user and end-use. Exports or re-exports of any U.S. technology to any destination under U.S. sanction or embargo are forbidden. Access to certain technology ("Controlled Technology") by Foreign Persons (working legally in the U.S.), as defined below, may require an export license if the Controlled Technology would require a license prior to delivery to the Foreign Person's country of origin. SELLER is bound by U.S. export statutes and regulations and shall comply with all U.S. export laws. SELLER shall have full responsibility for obtaining any export licenses or authorization required to fulfill its obligations under this Agreement. SELLER hereby certifies that all SELLER employees who have access to the Controlled Technology are U.S. citizens, have permanent U.S. residency or have been granted political asylum or refugee status in accordance with 8 U.S.C. 1324b(a)(3). Any non-citizens who do not meet one of these criteria are "Foreign Persons" within the meaning of this clause but have been authorized under export licenses to perform their work hereunder.

## 34. STANDARDS OF BUSINESS ETHICS & CONDUCT

ZEISS believes in fair and open competition and is committed to conducting its business fairly, impartially, and in an

ethical manner. These characteristics make it imperative that ZEISS employees adhere to a particularly high ethical standard. Employee ownership both demands and fosters highly ethical conduct because ZEISS can be successful only when employees look after long-term interests of the company and resist pressures to compromise ZEISS standards. ZEISS's expectation is that SELLER also will conduct its business fairly, impartially, and in an ethical and proper manner. SELLER acknowledges and, to the extent applicable, agrees to be bound to the principles and obligations set out in the ZEISS Code of Conduct. When requested, SELLER shall complete and provide to ZEISS the Representations and Certifications as found at https://www.sam.gov/portal.The Representations and Certifications must be updated annually by SELLER and provided to ZEISS. Upon ZEISS's request, SELLER shall execute other certifications as may be required under applicable law. SELLER further agrees to insert provisions that shall conform to the language of this clause, including this paragraph, in any subcontract, teaming or consultant agreement hereunder.

35. **ORGANIZATIONAL CONFLICTS OF INTEREST**

SELLER warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which could give rise to an organizational conflict of interest, as defined in Federal Acquisition Regulations (FAR) Subpart 9.5, or that it has disclosed all such relevant information in writing to the ZEISS. SELLER agrees that if an actual or potential organizational conflict of interest is discovered after award, it shall make full disclosure in writing to ZEISS no later than three (3) working days after such discovery. This disclosure shall include a description of actions that the SELLER has taken or proposes to take, after consultation with ZEISS, to avoid, mitigate, or neutralize the actual or potential conflict. ZEISS may terminate this Agreement, in whole or in part, if it deems such termination necessary to avoid an organizational conflict of interest. If SELLER was aware, or should have been aware, of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose, or misrepresented relevant information, to ZEISS, and ZEISS was not aware of such information prior to the execution of this Agreement, ZEISS may terminate the Agreement for default and pursue such other remedies as may be permitted by law. Parties shall take all reasonable steps necessary to ensure compliance with the Office of Federal Procurement Policy Act concerning Procurement Integrity and all applicable implementing regulations.

36. **ANTI-KICKBACK**

The Anti-Kickback Enforcement Act of 1986 as referenced in FAR 52.203-7 is hereby incorporated into this Order as a condition of acceptance. If there are reasonable grounds to believe that a violation, as described in paragraph (b) of FAR 52.203-7 may have occurred, or, if any influence or exchange of value other than as stated in this Order has been provided, this suspected violation should be reported to the Carl ZEISS Hotline at 1 800 537 4769. Suspected violations may be reported anonymously.

37. **NOTICES**

All notices, requests, consents, claims, demands, waivers, and other communications (a "Notice") must be in writing and addressed to the parties indicated on the face of the Order. All Notices must be delivered by hand, nationally recognized overnight courier (with all fees pre- paid), fax (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice only is effective upon its receipt by the receiving party, and if the party giving the Notice has complied with the requirements in this section.

38. **SEVERABILITY OF PROVISIONS**

If a court of competent jurisdiction deems any of the provisions in this Order to be invalid, illegal, or unenforceable, the remainder of the Agreement will remain valid and the Parties will work in good faith to amend such invalid provision in a manner that lawfully accomplishes the original intent of the invalid provision.

39. **SOCIAL RESPONSIBILITY**

ZEISS's goal is to have supply chain partners that are both informed and capable of working with us to meet our shared goals of environmental and social responsibility. ZEISS expects SELLER to operate with lawful, ethical, and social responsibility. SELLER's workers are not only all of lawful age and working status but are also treated with respect and dignity. SELLER's manufacturing and other processes are environmentally responsible. In addition to all obligations imposed by law or contract, where applicable ZEISS expects SELLER to commit to the principles of social and environmental responsibility EICC Code, which is located at: http://www.eicc.info/.

A. **Compliance:** SELLER will ensure their operations and the products and Services supplied to ZEISS comply with all national and other applicable laws and regulations.

B. **Environmental Management:** For operations, Goods, or Services provided to ZEISS, SELLER must understand and if possible, reduce their environmental impact.  For example, promoting efficient use of energy, resources, recycling and waste reduction, minimizing hazardous materials, and reducing emissions.

C. **REACH:** SELLER warrants that all chemical substances contained in the Goods and Services (including substances which SELLER does not make or import) comply in all respects with the provisions of (i) the European Regulation (EC) n° 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorization and Restriction of Chemicals entered into force on June 1st 2007 (the "REACH Regulation"), including, if and when applicable, being submitted for registration to the European Chemicals Agency according to statutory registration deadlines and (ii) the European Regulation (EC) n° 1272/2008, concerning the Classification, Labelling and Packaging entered into force on 20th January, 2009. SELLER will provide certification and relevant information to confirm the foregoing upon ZEISS's request.

D. **RoHS:** SELLER is responsible for compliance of Goods or Services with any applicable rules and regulations on restriction of hazardous substances ("RoHS") (e.g.: Directive 2002/95/EC as of 27 January 2003 and Directive 2011/65/EU as of 8 June 2011, as applicable, ("EU RoHS"), the Administrative Measures on the Control of Pollution Caused by Electronic Information Goods as of 28 February 2006 ("China RoHS"), etc.) and all national or local regulations issued in execution of RoHS. All Goods or Services will be fit for RoHS compliant production and sale. SELLER will, as reasonably requested, complete and sign ZEISS's standard Declaration of RoHS Compliance at the part number level, use appropriate systems and processes to ensure the accuracy of these determinations and maintain appropriate records to allow traceability of all Goods. If Goods or Services are not supplied in accordance with the RoHS requirements, ZEISS may cancel blanket or single orders at SELLER's expense. SELLER will promptly inform ZEISS of any changes affecting RoHS compliance. If SELLER is proven to violate national or international RoHS regulations, SELLER will hold ZEISS harmless from any claim, liability, loss, damage, judgment and external responsibility, irrespective their legal ground.

E. **WEEE:** As required by law, SELLER shall be responsible for the collection, treatment, recovery, or disposal of (i) the Goods or any part thereof when they are deemed by law to be 'waste' and (ii) any items for which the Goods or any part thereof are replacements. If SELLER is required by applicable law, including waste electrical and electronic equipment legislation, European Directive 2002/96/EC (WEEE) and related legislation in EU Member States, to dispose of 'waste' Goods or any part thereof, SELLER shall dispose of such Goods entirely at its own cost (including all handling and transportation costs).

F. **Conflict Minerals:** SELLER will take reasonable measures to ensure compliance to the Dodd-Frank Act requirements regarding conflict minerals, so that materials supplied to ZEISS  not contain metals derived from "conflict minerals" (columbite-tantalite (tantalum), cassiterite (tin), gold, wolframite (tungsten), or derivatives, that do not directly or indirectly finance or benefit armed groups through mining or mineral trading in the Democratic Republic of the Congo or an adjoining country ("DRC conflict free")). SELLER will establish policies, due diligence frameworks, and management systems, consistent with the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas.

G. **Management Systems:** SELLER is expected to maintain management systems that integrate environmental, occupational health and safety, human rights and labor policies, and ethics into

their business and decision-making processes. Effective management systems will include the means for analysis, review and continuous improvement.

**H.  Information:** SELLER will provide ZEISS with timely, truthful, clear reporting regarding SELLER's efforts under the foregoing provisions upon request.

40. **ADDITIONAL TERMS FOR ORDERS SUPPORTING GOVERNMENT CONTRACTS OR SUBCONTRACTS**

If this Order is in support of a U.S. Government contract or subcontract, SELLER shall comply with all of the following Federal Acquisition Regulations (FAR) provisions (see https://www.acquisition.gov/sites/default/files/current/far/pdf/FAR.pdf for full text of references), as applicable to this Order. SELLER further shall ensure that all agreements with subcontractors, vendors, or suppliers for Services or products pursuant to this Order (and if applicable the Prime Contract) contain these provisions, and all other terms of this Order that are necessary to ensure SELLER's compliance with the Prime Contract and this Order. The clauses in FAR Subpart 52.2 referenced below, in effect on the effective date of this Order, are incorporated herein and made a part of this Order. To the extent that an earlier version of any such clause is included in the Prime Contract (or subcontract) under which this Order is issued, the date of the clause as it appears in such Prime Contract or higher-tier subcontract shall be controlling and said version shall be incorporated herein. In all such clauses, unless the context of the clause requires otherwise, the term "Contractor" shall mean SELLER, the term "Contract" shall mean this Order, and the terms "Government," "Contracting Officer" and equivalent phrases shall mean ZEISS and ZEISS's Representative, respectively. It is intended that the referenced clauses shall apply to SELLER in such manner as is necessary to reflect the position of SELLER as a subcontractor to ZEISS, to insure SELLER's obligations to ZEISS and to the United States Government, and to enable ZEISS to meet its obligations under its Prime Contract or higher-tier Subcontract.

| | |
|---|---|
| 52.202-1 | DEFINITIONS (JUN 2020) |
| 52.244-6 | SUBCONTRACTS FOR COMMERCIAL ITEMS (JUN 2020) |
| 52.202-1 | DEFINITIONS (JUN 2020) |
| 52.203-3 | GRATUITIES (APR 1984) |
| 52.203-8 | CANCELLATION, RECISSION, AND RECOVERY FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (MAY 2014) |
| 52.203-10 | PRICE AND FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (MAY 2014) |
| 52.203-13 | CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (JUNE 2020) |
| 52.203-19 | PROHIBITION ON REQUIRING CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS OR STATEMENTS (JAN 2017) |
| 52.204-4 | PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (NOTE: ONLY IF ORDER EXCEEDS SIMPLIFIED ACQUISITION THRESHOLD.) |
| 52.204-7 | SYSTEM OF AWARD MANAGEMENT (OCT 2018) |
| 52.204-23 | PROHIBITION ON CONTRACTING FOR HARDWARE, SOFTWARE AND SERVICES DEVELOPED OR PROVIDED BY KASPERSKY LAB AND OTHER COVEERED ENTITIES (JULY 2018) |
| 52.204-24 | REPRESENTATION REGARDING CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (DEC 2019) |
| 52.204-25 | PROHIBITION ON CONTRACTING FOR CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPEMENT (AUG 2019) |
| 52.204-19 | INCORPORATION BY REFERENCE OF REPRESENTATIONS AND CERTIFICATIONS (DEC 2014) |
| 52.204-10 | REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS (JUN 2020) |
| 52.204-16 | COMMERCIAL AND GOVERNMENT ENTITY CODE REPORTING (JUL 2016) |
| 52.204-17 | OWNERSHIP OR CONTROL OF OFFEROR (JUL 2016) |
| 52.204-18 | COMMERCIAL AND GOVERNMENT ENTITY CODE MAINTENANCE (JUL 2016) |
| 52.204-19 | INCORPORATION BY REFERENCE OF REPRESENTATIONS AND CERTIFICATIONS (DEC 2014) |
| 52.204-20 | PREDECESSOR OF OFFEROR (JUL 2016) (As applicable) |

| 52.204-21 | BASIC SAFEGUARDING OF COVERED CONTRACTOR INFORMATION SYSTEMS (JUN 2016) |
|---|---|
| 52.204-7012 | SAFEGUARDING COVERED DEFENSE INFORMATION AND CYBER INCIDENT REPORTING (DEC 2019) |
| 52.209-2 | PROHIBITION ON CONTRACTING WITH INVERTED DOMESTIC CORPORATIONS − REPRESENTATION (NOV 2015) |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUN 2020) |
| 52.209-7 | INFORMATION REGARDGING RESPONSIBILITY MATTERS (OCT 2018) |
| 52.209-10 | PROHIBITION ON CONTRACTING WITH INVERTED DOMESTIC CORPORATIONS (NOV 2015) |
| 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS (APR 2008) |
| 52.249-8 | DEFAULT (FIXED PRICE SUPPLY AND SERVICE) (APR 1984), ALTERNATE I (JULY 1995) (Timely performance is a material element of this Contract) |
| 52.227-14 | RIGHTS IN DATA - GENERAL (MAY 2014). |
| 52.212-3 | OFFEROR REPRESENTATIONS AND CERTIFICATIONS (JUNE 2020*) (To be completed if Supplier is not registered in SAM; or, if registered, Supplier must indicate that its registration ins SAM is accurate, complete and current)* |
| 52.212-5 | CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS − COMMERCIAL ITEMS (JUL 2020) |
| 52.215-6 | PLACE OF PERFORMANCE (OCT 1997) |
| 52.215-11 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA - MODIFICATIONS (NOTE: RIGHTS AND OBLIGATIONS UNDER THIS CLAUSE SHALL SURVIVE COMPLETION OF THE WORK AND FINAL PAYMENT UNDER THIS ORDER) (NOTE: ONLY IF ORDER EXCEEDS THRESHOLD FOR COST OR PRICING DATA AT FAR 15.403-4, UNLESS EXEMPTION AT FAR 15.403-1 APPLIES.) |
| 52.215-20 | REQUIREMENTS FOR CERTIFIED COST OR PRICING DATA AND DATA OTHER THAN CERTIFIED COST OR PRICING DATA (OCT 2010) (ALTERNATE I − OCT 2010) (ALTERNATE IV − OCT 2010) |
| 52.215-21 | REQUIREMENTS FOR CERTIFIED COST OR PRICING DATA AND DATA OTHER THAN CERTIFIED COST OR PRICING DATA − MODIFICATIONS (JUN 2020) (ALTERNATE I − OCT 2010) (ALTERNATE IV − OCT 2010) |
| 52.216-19 | ORDER LIMITATIONS (OCT 1995) |
| 52.219-3 | NOTICE OF HUBZONE SET-ASIDE OR SOLE SOURCE AWARD (MAR 2020) |
| 52.219-6 | NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE (MAR 2020) (ALTERNTE I − MAR 2020) |
| 52.219-28 | POST-AWARD SMALL BUSINESS PROGRAM REPRESENTATION (MAY 2020) |
| 52.222-1 | NOTICE TO THE GOVERNMENT OF LABOR DISPUTES (FEB 1997) |
| 52.222-3 | CONVICT LABOR (JUN 2003) |
| 52.222-4 | CONTRACT WORK HOURS AND SAFETY STANDARDS − OVERTIME COMPENSATION (MAY 2018) (Applies if this Contract may require or involve the employment of laborers and mechanics) |
| 52.222-19 | CHILD LABOR − COOPERATION WITH AUTHORITIES AND REMEDIES (JAN 2020) (Different thresholds for different countries of manufacture) |
| 52.222-22 | PREVIOUS CONTRACTS AND COMPLIANCE REPORTS (FEB 1999) |
| 52.222-39 | NOTIFICATION OF EMPLOYEE RIGHTS CONCERNING PAYMENT OF UNION DUES OR FEES (DEC 2004) (NOTE: APPLIES IF ORDER PRICE EQUALS OR EXCEEDS THE "SIMPLIFIED ACQUISITION THRESHOLD" AS DEFINED AT FAR 2.101) |
| 52.222-40 | NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT (DEC 2010) (Note 7 applies) |
| 52.222-43 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS-PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (AUG 2018) |
| 52.222-48 | EXEMPTION FROM APPLICATION OF THE SERVICE CONTRACT LABOR STANDARDS TO CONTRACTS FOR MAINTENANCE, CALLIBRATION, OR REPAIR OF CERTAIN EQUIPMENT − CERTIFICATION (MAY 2014) |
| 52.222-51 | EXEMPTION FROM APPLICATION OF THE SERVICE CONTRACT LABOR STANDARDS TO CONTRACTS FOR |

|  | MAINTENANCE, CALLIBRATION, OR REPAIR OF CERTAIN EQUIPMENT – REQUIREMENTS (MAY 2014) |
| 52.222-52 | EXEMPTION FORM APPLICATION OF THE SERVICE CONTRACT LABOR STANDARDS TO CONTRACTOS FOR CERTAIN SERVICES-CERTIFICATION (MAY 2014) |
| 52.222-21 | PROHIBITION OF SEGREGATED FACILITIES (APR 2015) |
| 52.222-25 | AFFIRMATIVE ACTION COMPLIANCE (APR 1984) |
| 52.222-26 | EQUAL OPPORTUNITY (SEP 2016) |
| 52.222-50 | COMBATING TRAFFICKING IN PERSONS (JAN 2019) |
| 52.222-54 | EMPLOYMENT ELIGIBILITY VERIFICATION (OCT 2015) (Applicable if this Contract has a value of more than $3000 unless an exception contained in FAR 52.222-54(e)(1) applies) |
| 52.223-5 | POLLUTION PREVENTION AND RIGHT-TO-KNOW INFORMATION (MAY 2011) |
| 52.223-6 | DRUG FREE WORKPLACE (NOTE: ONLY IF SUBCONTRACT EXCEEDS SIMPLIFIED ACQUISITION THRESHOLD.) |
| 52.223-15 | ENERGY EFFICIENCY IN ENERGY-CONSUMING PRODUCTS (MAY 2020) |
| 52.223-18 | ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE DRIVING (JUN 2020) |
| 52.224-1 | PRIVACY ACT NOTIFICATION (APR 1984) |
| 52.224-2 | PRIVACY ACT (APRL 1984) |
| 52.225-1 | BUY AMERICAN – SUPPLIES (MAY 2014) |
| 52.225-5 | TRADE AGREEMENTS (OCT 2019) |
| 52.225-6 | TRADE AGREEMENTS CERTIFICATE (MAY 2014) |
| 52.225-8 | DUTY FREE ENTRY (OCT 2010) |
| 52.225-13 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (JUNE 2008) |
| 52.225-25 | PROHIBITION ON CONTRACTING WITH ENTITITIES ENGAGING IN CERTAIN ACTIVITIES OR TRANSACTIONS RELATING TO IRAN – REPRESENTATIONS AND CERTIFICATIONS (JUN 2020) |
| 252.225-7009 | RESTRICTION ON ACQUISITION OF CERTAIN ARTICLES CONTAINING SPECIALTY METALS (DEC 2019) |
| 52.227-1 | AUTHORIZATION AND CONSENT (JUN 2020) |
| 52.227-11 | PATENT RIGHTS-OWNERSHIP BY THE CONTRACTOR (MAY 2014) |
| 52.227-13 | PATENT RIGHTS-OWNERSHIP BY THE GOVERNMENT (DEC 2007) |
| 52.228-3 | WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT) (JUL 2014) |
| 552.228-5 | GOVERNMENT AS AN ADDITIONAL INSURED (JAN 2016) |
| 52.229-1 | STATE AND LOCAL TAXES (APR 1984) |
| 52.230-4 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES-FOREIGN CONCERNS (JUN 2020) |
| 52.232-40 | PROVIDING ACCELERATED PAYMENTS TO SMALL BUSINESS SUBCONTRACTORS (DEC 2013) |
| 52.237-1 | SITE VISIT (APR 1984) |
| 52.242-5 | PAYMENTS TO SMALL BUSINESS SUBCONTRACTORS (JAN 2017) |
| 52.242-13 | BANKRUPTCY (JUL 1995) |
| 52.242-15 | STOP WORK ORDER (AUG 1989) |
| 52.243-1 | CHANGES - FIXED PRICE (AUG 1987) |
| 52.246-2 | INSPECTION OF SUPPLIES - FIXED PRICE (AUG 1996) |
| 52.246-4 | INSPECTION OF SERVICES – FIXED PRICE (AUG 1996) |
| 52.247-32 | F.O.B. ORIGIN, FREIGHT PREPAID (FEB 2006) |
| 52.247-34 | F.O.B. DESTINATION (NOV 1991) |
| 52.247-38 | F.O.B. INLAND CARRIER, POINT OF EXPIRATION (FEB 2006) |
| 52.247-39 | F.O.B. INLAND POINT, COUNTRY OF EXPORTATION (APR 1984) |
| 52.247-63 | PREFERENCE FOR U.S.-FLAG AIR CARRIERS (JUN 2003) (Applies is contract involves international air transportation) |
| 52.247-64 | PREFERENCE FOR PRIVATELY OWNED U.S.-FLAG COMMERCIAL VESSELS (FEB 2006) |
| 52.247-65 | F.O.B. ORIGIN, PREPAID FREIGHT-SMALL PACKAGE SHIPMENTS (JAN 1991) |

5.247-68       REPORT OF SHIPMENT (REPSHIP) (FEB 2006)

52.249-2       TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 2012)

52.252-2       CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

552.203-71     RESTRICTION ON ADVERTISING (SEP 1999)

552.211-73     MARKING (FEB 1996)

552.211-77     PACKING LIST (FEB 1996)

552.211-89     NON-MANUFACTURED WOOD PACKAGING MATERIAL FOR EXPORT (JUL 2016)

552.212-71     CONTRACT TERMS AND CONDITIONS APPLICABLE TO GSA ACQUISITION OF COMMERCIAL ITEMS (MAY 2019)

552.212-72     CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS APPLICABLE TO GSA ACQUISTION OF COMMERCIAL ITEMS

552.246-78     INSPECTION AT DESTINATION (JUN 2009)


The following clauses apply to this Contract if the value of the Contract equals or exceeds $15,000:

52.222-36      EQUAL OPPORTUNITY FOR WORKERS WITH DISABILITIES (JUNE 2020)


The following clauses apply to this Contract if the value of the Contract equals or exceeds $150,000:

52.203-6       RESTRICTIONS ON SUBCONTRACTORS SALES TO THE GOVERNMENT (JUN 2020)

52.203-7       ANTI-KICKBACK PROCEDURES (JUN 2020)

52.203-11      CERTIFICATION AND DISCLOSURE REGARGING PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (SEP 2007)

52.203-12      LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 2020)

52.203-14      DISPLAY OF HOTLINE POSTERS (JUN 2020)

52.203-17      EMPLOYEE WHISTLEBLOWER RIGHTS AND REQUIREMENT TO INFORM EMPLOYEES OF WHISTLEBLOWER RIGHT

52.209-5       CERTIFICATION REGARDING RESPONSIBILITY MATTERS (OCT 2015)

52.215-2       AUDIT AND RECORDS-NEGOTIATION (JUN 2020)

52.215-14      INTEGRITY OF UNIT PRICES (JUN 2020)

52.219-8       UTILIZATION OF SMALL BUSINESS CONCERNS (Oct 2018)

52.222-35      EQUAL OPPORTUNITY FOR VETERANS (JUN 2020)

52.222-37      EMPLOYMENT REPORTS ON VETERANS (JUN 2020)

52.227-2       NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (JUN 2020)


The following clauses apply to this Contract if the value of the Contract equals or exceeds $500,000:

52.222-56      CERTIFICATION REGARDING TRAFFICKING IN PERSONS COMPLIANCE PLAN (MAR 2015)


The following clauses apply to this Contract if the value of the Contract equals or exceeds $700,000:

52.219-9       SMALL BUSINESS SUBCONTRACTING PLAN (JUN 2020)

52.219-16      LIQUIDATED DAMAGES - SUBCONTRACTING PLAN (JAN 1999)


The following clauses apply to this Contract if the value of the Contract equals or exceeds $750,000:

52.215-12      SUBCONTRACTOR CERTIFIED COST OF PRICING DATA (JUN 2020)

52.215-13      SUBCONTRACTOR CERTIFIED COST OR PRICING DATA − MODIFICATIONS (JUN 2020)


The following clauses apply to this Contract if the value of this Contract exceeds $5,000,000:

52.209-12      CERTIFICATION REGARDING TAX MATTERS (FEB 2016)

The following clauses apply as indicated:

| | |
|---|---|
| 52.204-2 | SECURITY REQUIREMENTS (AUG 1996) |
| 52.204-9 | PERSONAL INDENTITY VERIFICATION OF CONTRACTOR PERSONNEL (JAN 2011) |
| 552.211-75 | PRESERVATION, PACKAGING, AND PACKAGING (FEB 1996) (ALTERNATE I – MAY 2003) |
| 52.215-19 | NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997) |
| 52.222-41 | SERVICE CONTRACT LABOR STANDARDS (AUG 2018) |
| 52.222-55 | MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 (DEC 2015) |
| 52.223-1 | BIOBASED PRODUCT CERTIFICATION (MAY 2012) |
| 52.223-3 | HAZARDOUS MATERIAL IDENITIFICATION AND MATERIAL SAFETY DATA (JAN 1997) |
| 52.223-7 | NOTICE OF RADIOACTIVE MATERIALS (JAN 1997) |
| 52.223-10 | WASTE REDUCTION PROGRAM (MAY 2011) |
| 52.223-11 | OZONE-DEPLETING SUBSTANCES AND HIGH GLOBAL WARMIN POTENTIAL HYDROFLUOROCARBONS (JUN 2016) |
| 52.230-2 | COST ACCOUNTING STANDARDS (JUN 2020) |
| 52.230-3 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES (JUN 2020) |
| 52.233-3 | PROTEST AFTER AWARD (AUG 1996) |
| 552.238-100 | TRANSSHIPMENTS (MAY 2019) |
| 52.239-1 | PRIVACY OR SECURITY SAFEGUARDS (AUG 1996) (Applicable if Supplies involve information technology which require security of information technology, and/or are for the design, development or operation of a system or records using commercial information technology services or support services.) |
| 52.245-1 | GOVERNMENT PROPERTY (JAN 2017) |
| 252.203-7005 | REPRESENTATION RELATING TO COMPENSATION OF FORMER DOD OFFICIALS (NOV 2011) |
| 252.204-7000 | DISCLOSURE OF INFORMATION (OCT 2016) |
| 252.204-7008 | COMPLIANCE WITH SAFEGUARDING COVERED DEFENSE INFORMATION CONTROLS (OCT 2016) |
| 252.204-7012 | SAFEGUARDING COVERED DEFENSE INFORMATION AND CYBER INCIDENT REPORTING (DEC 2019) |
| 252.209-7001 | DISCLOSURE OF OWNERSHIP OR CONTROL BY THE GOVERNMENT OF A TERRORIST COUNTRY (JAN 2009) |
| 252.233-7006 | PROHIBITION ON STORAGE, TREATMENT, AND DISPOSAL OF TOXIC OR HAZARDOUS MATERIALS - BASIC (SEP 2014) |
| 252.227-7015 | TECHNICAL DATA - COMMERCIAL ITEMS (FEB 2014) |
| 252.227-7028 | TECHNICAL DATA OR COMPUTER SOFTWARE PREVIOUSLY DELIVERED TO THE GOVERNMENT (JUN 1995) |
| 252.227-7030 | TECHNICAL DATA - WITHHOLDING OF PAYMENT (MAR 2000) |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA (SEP 2016) |

The following clauses apply to this Contract if the value of this Contract equals or exceeds $150,000:

| | |
|---|---|
| 252.223-7004 | DRUG FREE WORK FORCE (SEP 1988) |
| 252.243-7002 | REQUEST FOR EQUITABLE ADJUSTMENT – BASIC (DEC 2012) (Applies if contract is to exceed $150,000) |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA - BASIC (FEB 2019) (ALTERNATE I & ALTERNATE II – FEB 2019) |
| 252.249-7002 | NOTIFICATION OF ANTICIPATED CONTRACT TERMIMTATION OR REDUCTION (JUN 2020) (Applies if subcontract is greater than $150,000 |

The following DFARS clauses apply to this Contract as indicated:

| | |
|---|---|
| 252.211-7003 | ITEM UNIQUE IDENTIFICATION AND VALUATION (MAR 2016) |

| 252.211-7007 | REPORTING OF GOVERNMENT-FURNISHED PROPERTY (AUG 2012) |
|---|---|
| 252.215-7013 | SUPPLIES AND SERVICES PROVIDED BY NONTRADITIONAL DEFENSE CONTRACTORS (JAN 2018) |
| 252.219-7003 | SMALL BUSINESS SUBCONTRACTING PLAN – BASIC (DoD Contracts) (DEC 2019) (Applicable if Contract exceeds $700,000) |
| 252.223-7001 | HAZARD WARNING LABELS (DEC 1991) |
| 252.223-7008 | PROHIBITION ON HEXAVALENT CHROMIUM (JUN 2013) |
| 252.225-7001 | BUY AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM – BASIC (DEC 2017) |
| 252.225-7013 | DUTY FREE ENTRY (APR 2020). |
| 252.225-7016 | RESTRICTION ON ACQUISITION OF BALL AND ROLLER BEARINGS (JUNE 2011) |
| 252.225-7021 | TRADE AGREEMENTS - BASIC (SEP 2019) |
| 252.225-7972 | PROHIBITION ON THE PROCUREMENT OF FOREIGN-MADE UNMANNED AIRCRAFT SYSTEMS (MAY 2020) (DEVIATION 2020-O0015) |
| 252.225-7973 | PROHIBITION ON THE PROCUREMENT OF FOREIGN-MADE UNMANNED ARICRAFT SYSTEM - REPRESENTATION (MAY 2020) (DEVIATION 2020 O0015) |
| 252.225-7974 | REPRESENTATION REGARDING BUSINESS OPERATIONS WITH THE MADURO REGIME (DEVIATION 2020-O0005) (FEB 2020) |
| 252.226-7001 | UTILIZATION OF INDIAN ORGANIZATIONS, INDIAN-OWNED ECONOMIC ENTERPRISES, AND NATIVE HAWAIIAN SMALL BUSINESS CONCERNS (APR 2019) (Applies if contract exceeds $500,000) |
| 252.227-7038 | PATENT RIGHTS - OWNERSHIP BY THE CONTRACTOR (LARGE BUSINESS) (JUN 2012) |
| 252.239-7016 | TELECOMMUNICATIONS SECURITY EQUIPMENT, DEVICES, TECHNIQUES AND SERVICES (DEC 1991). |
| 252.244-7000 | SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (JUNE 2013) |
| 252.245-7001 | TAGGING, LABELLING & MARKING OF GOVERNMENT – FURNISHED PROPERTY (APR 2012 |
| 252.246-7001 | WARRANTY OF DATA – BASIC (MAR 2014) |
| 252.246-7003 | NOTIFICATION OF POTENTIAL SAFETY ISSUES (JUN 2013) |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA (FEB 2019) |

SELLER shall also comply with any other FAR or DFARS provisions expressly made applicable to this Order by ZEISS.

Connecticut General Statutes §4a-60(a)(l) and §4a-60a(a)(l), as amended in State of Connecticut Public Act 07-245 and sections 9(a)(l) and 10(a)(l) of Public Act 07-142.



**Oakland Automation, LLC**
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

September 24th, 2021

Mr. Vernon Woldhuis
ZEISS Industrial Quality Solutions
29295 Lyon Oaks Drive
Wixom, MI 48393

Subject:   ZEISS ABIS BIW TMMTX System Integration
           OA Proposal: Q210057B

Dear Mr. Woldhuis:

Oakland Automation, LLC (OA) is pleased to offer ZEISS the following revised proposal per your request for your ZEISS ABIS BIW Proposal for Toyota Texas in San Antonio, Texas.

This proposal will cover the Engineering, Integration, Provision, Assembly, Modular Build, Installation and Start-Up of the Robot ABIS BIW System.

This proposal is based upon the ZEISS RFQ Revision A dated July 23rd, 2021, our phone conversations and our site visit to review along with our knowledge of Robotic System Integration, Kawasaki and Toyota.

Thank you in advance for your consideration and use of Oakland Automation.  I trust this meets with your approval and I look forward to working with you on your upcoming project.

Respectfully submitted,

*Chris Muzzin*

Chris Muzzin
Sales Engineering Manager
Oakland Automation



Oakland Automation, LLC
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

**General Information**
It is our understanding that ZEISS is working with TMMTX to provide a Robotic ABIS
BIW System for inspecting the new model Toyota Sequoia's. This system will be
installed on the moving finish line, CS1.

The inspection system will incorporate three (3) ZEISS ABIS Sensors mounted to three
(3) Kawasaki RS080N Industrial Robots. The robots will be mounted to an arch that will
allow the vehicle to pass though for inspection. Robotic skew guidance will be provided
by a Liberty Reach 6-Sensor VFix System located downstream. Two (2) ZEISS ABIS
Monitoring Stations will be located on the upstream operator deck.

The indicated schedule is a November PO award with system installation in TMMTX
during SSD2022.

This proposal will cover all work required to integrate & install the robotic inspection
system. ZEISS would drop-ship the ABIS Equipment specified in the RFQ. Toyota
would drop-ship the Kawasaki Robots & Controllers.

**Robotic Inspection System**
Oakland Automation will provide a full, mechanical and electrical engineering drawing
package that will cover all aspects of system integration and installation. All PLC and
HMI programming is included.

Our robot process engineering group will provide a reach study for the arch and three
robots along with an offline programming package for two (2) body styles. Once the
scope of work is clarified with what Toyota SEIBI will provide for modular build & field
support, Oakland can modify and adjust our proposal.

Oakland will design and fabricate an Arch that spans the existing conveyor pit and holds
the three (3) robots for this proposal and two (2) future. A safety fence will enclose the
arch & robotic area. The fence will have two (2) swing doors for personnel entry/exit.

Oakland Automation will receive & integrate three (3) Kawasaki RS080N Industrial
Robots & Controllers.

Oakland Automation will receive & integrate the ZEISS ABIS System that includes the
Robotic Sensors & EOAT, ZEISS Sensor Panels, Cables & Monitor Package.

Oakland Automation will provide & integrate the Liberty Reach VFix 6-Sensor Robotic
Guidance System.



**Oakland Automation, LLC**
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

The robotic system will utilize an operator control console with a Toyopuc Safety PLC and HMI.  The PLC will communicate with a combination of FL-net and Ethernet to control and operate the robotic system.  The operator console includes all required pushbuttons, pilot lights, selector switches and E-Stops.   Oakland has also included for limit and/or proximity switches for providing job starts and data triggering.

Based upon our site visit and system integration into an existing safety cell, we have included for two (2) E-Stop PB Boxes.  Oakland has included for integrating the existing safety devices such as light curtains, muting switches and gate interlocks from the existing safety cell controls. Oakland has not included for any safety fence modifications.

The Liberty Reach VFix System will be installed upstream of the robotic ZEISS inspection system.  Upon a triggered start signal, the VFix System will provide skew guidance for the vehicle & carrier to the robotic PLC over Ethernet.  The PLC will track the vehicle and upon the appropriate start signals, transfer the skew data and trigger the inspection process.

Oakland Automation will provide one (1) dedicated PDP for system power and single point of Lock-Out for the robotic system.

Oakland Automation will provide one (1) conveyor encoder to be attached to the existing drive unit for line tracking.

**Conveyor Communication & Model ID**
Oakland Automation will receive conveyor interlocking information via Ethernet from the existing conveyor supplier.  The robotic PLC can obtain the Model ID information from the conveyor system or Plant FIS.  This data can also be entered on the operator console as a back-up.

**Modular Build & Quality Check**
Oakland Automation will be responsible to engineer the modular build configuration to replicate the plant vehicle/robot configuration.  OA as a team, will receive robot positioning and part reference information from ZEISS, TMMTX, TEMA and SEIBI to perform this work.

Oakland Automation will utilize our modular build facility in Livonia, Michigan for the full assembly, testing and run-off/quality check.  Oakland will receive and unload all equipment provided for modular build.  We will provide all trades & equipment to fully setup the system.  OA will provide a conveyor system to be utilized for the verification of the system.  Clean, dry compressed air along with 480VAC/3 phase power are also included.



**Oakland Automation, LLC**
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

Oakland Automation will coordinate and work with ZEISS, TEMA, TMMTX, and SEIBI to design, schedule, plan and support the modular build/quality check process.  Oakland will have engineering and trades available during the modular build process to cover issues that may arrive and support the de-bug, start-up and process work required to verify & test the new robotic system.

After the modular build & validation is finished, Oakland Automation will disassemble, crate and ship the system to TMMTX.

**General Installation**
Oakland Automation will provide a fully engineered installation plan.  This plan will incorporate all vendors, suppliers, sub-contractors and personnel required to properly perform install & commission the Robotic Inspection System.

Oakland Automation will provide all trades & equipment required to perform the installation of the new robotic system.

Oakland Automation will have a full team of mechanical, electrical, PLC and process/robot programmers onsite perform de-bug, start-up and process work required to launch the new robotic system.

Oakland Automation will follow and conform to all Toyota processes for the site management and installation.  OA will follow and conform to the Kanban process, NA-MTS, NFPA, NEC (NFPA 70E), OSHA and NEMA/S.

Oakland Automation will coordinate and work with ZEISS, TMMTX, TEMA, and SEIBI to fully install the new ABIS BIW System into the TMMTX Facility as well as perform quality checks and system validation.

Oakland Automation will provide system operation manuals and training along with As-Built Drawings, Equipment Bills of Material and recommended spare parts.



**Oakland Automation, LLC**
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

**Scope of Delivery Summary**
Oakland Automation Services
- Provide Project & Site Management
- Provide Engineering & Design Integration & Installation Packages
- Provide Offline Robotic Simulation & Programming Package
- Provide PLC & HMI Programming
- Provide Liberty Reach System Integration
- Receive & Integrate ZEISS ABIS Equipment Package
- Receive & Integrate Kawasaki Robotic Equipment
- Provide Modular Build Facility & Set-Up
- Provide Modular Build Trades & Equipment
- Provide Modular Build Testing & Confirmation
- Provide Crating & Shipment of Equipment to TMMTX
- Receive & Unload Equipment at TMMTX
- Provide all Installation Trades, Material & Equipment
- Provide Engineering & Process Labor for Start-Up & Debug
- Provide As-Builts, System Manuals & Operator Training

System Equipment Received
- One (1) Lot, ZEISS ABIS BIW Inspection Equipment/System
- Three (3) Kawasaki RS080N Robots & Controllers

System Equipment Supply
- Provide Liberty Reach 6-Sensor VFix Guidance System
- Provide One (1) Structural Arch
- Provide One (1) Power Distribution Panel (PDP)
- Provide One (1) Operator Console w/PLC & HMI
- Provide One (1) Lot, System Field Devices
- Provide One (1) Lot, System Cables

**Clarifications**
- Costs incurred by OA due to schedule and site delays caused by others will be reimbursed by others.
- Oakland Automation and its Sub-Contractors will not perform any work considered outside the contracted scope of work without an authorized change order covering the extra work.
- Oakland has not included for light curtains, muting sensors or gate interlock switches at this time. The ABIS Cell will be integrated into the existing safety zone.



Oakland Automation, LLC
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

**Pricing:**

| | |
|---|---|
| OA Integration Services | $240,832.00 |

- Project Management
- Mechanical & Electrical Engineering & Design
- PLC & HMI Programming
- Offline Simulation & Robot Programming
- Site Supervision
- Safety

| | |
|---|---|
| Miscellaneous Costs | $34,590.00 |

- Oakland Travel Expenses
- Project/Jobsite Expenses
- Crating & Shipping
- Operator Manuals & Documentation

| | |
|---|---|
| System, Controls & Field Equipment | $48,520.00 |

- Control Panels/PDP Equipment
- System Cables
- Safety Fence
- Field & Safety Devices

| | |
|---|---|
| Liberty Reach VFix System | $135,835.00 |

- 6-Sensor System
- System Equipment & Cables
- Site Support

| | |
|---|---|
| Structural Arch | $53,690.00 |

- Structural Arch & Mounting Hardware

| | |
|---|---|
| Modular Build | $45,055.00 |

- Modular Build & Validation

| | |
|---|---|
| Robotic & System Installation | $88,945.00 |

- Mechanical & Electrical Labor
- Installation Material

| | |
|---|---|
| OH&P | $56,180.00 |
| **Proposal Total** | **$703,647.00** |
| Pricing Revision - Deduct | ($53,647.00) |
| **Revision B Pricing:** | **$650,000.00** |



**Oakland Automation, LLC**
13017 Newburgh Road
Livonia, Michigan 48150
www.oaklandautomation.com

**Optional Pricing:**

Remove Offline & On-Site Robotic Programming          ($27,990.00)

- Remove Labor & Travel Expenses
- ZEISS would be responsible for all offline simulation & onsite robotic programming.  ZEISS would be responsible for confirming final robot locations.

**Payment Terms**

- 50% Downpayment ARO
- 40% Upon Equipment Shipping, Net 30
- 10% Upon Final Acceptance, Net 30